### UPDIKE GRAIN CO. v. P. P. WILLIAMS GRAIN CO.

(Circuit Court of Appeals, Eighth Circuit. July 17, 1912.)

No. 3,642.

SALES (§ 72*)—CONTRACT FOR SALE OF GRAIN—CONSTRUCTION—"COUNTRY RUN" OATS.

Evidence considered, and *held* to sustain a finding that "country run" oats, according to the usage and understanding of the grain trade, means the grain as it comes from country stations in car load lots, with the identity of the contents of the several cars preserved, and that a contract for the sale of such oats was not complied with by furnishing oats which had been in a terminal elevator.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 197–202; Dec. Dig. § 72.*]

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

Action at law by the Updike Grain Company against the P. P. Williams Grain Company. Judgment for defendant, on counterclaim, and plaintiff brings error. Affirmed.

Richard A. Jones and Smyth, Smith & Schall, for plaintiff in error.

Arthur B. Shepley and Nagel & Kirby, for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and WILLARD, District Judge.

WILLARD, District Judge. On the 31st of August, 1908, the plaintiff, Updike Grain Company, and defendant, P. P. Williams Grain Company, at Omaha, Neb., entered into a contract in writing for the sale by the plaintiff and the purchase by defendant of 100,000 bushels of No. 3 White Oats at 50 cents per bushel; 50,000 bushels of which were to be delivered the first half of October at St. Louis, Mo., following the contract, and the other 50,000 bushels

to be delivered the last half of October at St. Louis, Mo., following the contract. This contract provided that the Omaha weights and inspection should control. The oats were to be what is known as "country run" oats, and the whole question turns upon what "country run" means in this contract.

On October 1, 1908, plaintiff shipped to St. Louis on account of the contract in question, 24 cars of oats, containing 30,937 bushels. The bills of lading therefor were attached to a draft on defendant for $14,676.76, which draft was presented to and paid by defendant before the arrival of the oats in St. Louis. As soon as defendant received the oats, it notified plaintiff that the oats were not, in its judgment, "country run" oats, and requested plaintiff to take back the same, which request was refused. Thereafter, on or about October 5, 1908, plaintiff shipped to defendant 14 cars containing 19,218 bushels of oats, and on October 19, 36 cars containing 46,718 bushels, all of which the defendant refused to receive and pay for. Plaintiff brought this action to recover $3,210.66, the difference between the price which the defendant agreed to pay and the price at which the plaintiff was obliged to sell that part of the oats which the defendant refused to receive. The defendant interposed a counterclaim for $1,062.50, the difference between what it had paid for the oats which it received, and what those oats were worth. The case was tried by the court without a jury, and judgment entered for the defendant on its counterclaim for $773.42.

The court made the following finding:

"(8) All of the oats shipped by plaintiff to defendant were loaded out of the South Omaha elevator of plaintiff from bins in which there had, during the previous month, been accumulated, stored, and commingled the contents of various cars. In making this shipment to defendant, in no case was the identity of the contents of any car as it ran from a country station preserved; but in each case the car was loaded from the stock which had been accumulated and stored in the bins of the elevator."

No objection is made to this finding by either party. The claim of the plaintiff is that the oats came from country elevators in different cars, that these cars containing nothing but country elevator oats were all placed in the same bin, that they were not mixed with any other oats or with anything else, and that the identical oats which were put in the bin were loaded into cars and shipped to the defendant; and the plaintiff insists that after being handled in this way they were "country run" oats. The defendant claims that in order to be "country run" oats the identity of the oats as they came from the country must be preserved; that if it is necessary to transfer them from the car into which they were loaded at the country elevator that transfer must be what is known as a direct transfer, that is, from car to car; and that if the oats are put into a bin in a terminal elevator, even though the same oats are later taken out of the bin, they cease to be "country run" oats.

Upon this question the court found as follows:

"(5) By the general and established usage and understanding of the grain trade among merchants and dealers, the term 'country run,' when used in a contract for the sale of grain, meant and signified grain as it came in from

country stations in car load lots,. with the identity of the contents of the several cars preserved, which had never been accumulated or stored in a terminal market elevator in bins in which the contents of a number of cars had been mixed or mingled. This general usage and understanding was known to both parties, and no established local usage to the contrary was shown to exist in Omaha. Omaha was a terminal market and the South Omaha elevator of plaintiff was a terminal market elevator within the meaning of that term."

This finding is fatal to the plaintiff if there is evidence to sustain it. The evidence is ample to show that the custom required the identity of the grain to be preserved, and forbade its entrance into a terminal elevator. There is also evidence to support the court's finding that the rule in Omaha did not differ from the rule. elsewhere prevailing. . Some of this evidence can be found in the testimony of the plaintiff's own witnesses. Cope, its treasurer, testified as follows:

"Q. It is understood to mean grain from the country elevator as distinguished from a terminal elevator? A. Yes; at the same time it could be 'country run' out of a terminal elevator.

"Q. That is not the general understanding? A. No, it is not."

He also testified as follows:

"Q. And that general meaning is that it is oats that has not been through a terminal market; that is the general meaning? A. It is generally understood that 'country run' oats are oats that are not from a terminal market, although they ship 'country run' oats through a terminal market. * * *

"Q. Suppose the Williams Company, in their elevator here (St. Louis) handled those oats in identically the same way you handled them in your South Omaha elevator; would they not be 'country run,' according to your definition, when loaded out for shipment to Chicago, Nashville, or anywhere else? A. No, sir.

"Q. You say they would not? A. No, sir."

Kearney, the plaintiff's superintendent, at the time of the transaction, testified as follows:

"Q. Why did you say, Mr. Kearney, that you would not have put into your South Omaha elevator with these oats, oats that came from a terminal market? A. Because I could not do it and be sure that they were 'country run' oats.

"Q. Because you would not know when they went into that elevator whether something had been done to them when they came out; is not that the fact? A. That is, the elevator from which we received them?

"Q. Yes. A. Yes, sir.

"Q. In other words, you think with respect to that grain that before you call it 'country run' you are entitled to the insurance of that fact, with the further fact that the grain comes in in the original car from the country? A. To be sure of it being 'country run' I would expect—

"Q. It would have to come in in the car from the country? A. From the country station.

"Q. In order to satisfy you it was 'country run'? A. Yes, sir.

"Q. And you would not receive anything that did not have that stamp of genuineness on it? The fact that it was in the original car? A. I would not consider it 'country run' oats."

Huntley, another witness for plaintiff, testified as follows:

"Q. But the identity of that car, that is, the identity of the contents of that car is preserved, is it not? A. It is supposed to be.

"Q. Well, in the absence of dishonesty it is, is it not? A. Where there is a direct transfer."

It is evident from the testimony that, if when a contract is made nothing more is said or done than to put the words "country run" into it, the phrase does not indicate the quality of the grain, but rather the way in which it is handled. The rules of the Omaha Grain Exchange contain no mention of "country run" as a grade or description of grain. Under the terms of this contract which provides for Omaha weights and inspection, the officials of the Exchange had authority to determine whether the oats shipped to the defendant were No. 3 white oats and to weigh them, but they had no authority to determine whether or not they were "country run."

When the defendant bought "country run" oats, it bought not only oats that came from country elevators, but also oats that had never been in a terminal elevator at Omaha. What the defendant wanted was oats which, originating in the country, had not been mixed with other oats or with anything else. The only way to be sure of that was to provide that they should not go through a terminal elevator. Once put in an elevator, no one could tell what would happen to them. Reliance would have to be placed upon what the men in charge of the elevator said had happened to them. For some reason the trade was not willing to so rely. The plaintiff's treasurer was asked: Supposing that, after the defendant received this grain from the plaintiff, it had shipped' it to Kansas City, if that grain would there be considered to be "country run," and he answered that he would not so consider it. When asked why, he replied, "Because I don't know whether Williams & Co. mixed it in the elevator or not, or anything about it."

The only proof in this case that the identical oats received from the country elevators, after being stored some time in plaintiff's elevator at Omaha, went to the defendant in St. Louis, is the parol testimony of the plaintiff's superintendent, which is not altogether satisfactory.

That the words "country run" may sometimes be used in a different sense from that stated in the findings is indicated in some of the evidence for the plaintiff. But that same evidence (of the plaintiff's treasurer) also indicates that, when they are used in a different sense than that above specified, "all the facts surrounding the grain must be thoroughly understood between the buyer and the seller, and probably a sample submitted, so they can arrive at an intelligent basis to frame up their contract."

The claim that the oats had to go into a bin in a terminal elevator at Omaha in order to be weighed and inspected, the contract providing for Omaha weights and inspection, finds no support even in the testimony of the plaintiff's own witnesses.

The judgment of the court below is affirmed, with costs.